UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT EVANS, Individually and on Behalf of All Other Persons Similarly Situated, | § § § | |
| | § | CIVIL ACTION NO. _____ |
| Plaintiff, | § | |
| | § | |
| v. | § | **JURY TRIAL DEMAND** |
| | § | |
| PAA NATURAL GAS STORAGE, L.P., | § | |
| PLAINS ALL AMERICAN PIPELINE, L.P., | § | |
| PNGS GP LLC, GREG L. ARMSTRONG, | § | |
| HARRY N. PEFANIS, CONSTANTINE S. | § | |
| LIOLLIO, AL SWANSON, BOBBY S. | § | |
| SHACKOULS, VICTOR BURK, ARTHUR L. | § | |
| SMITH, PAA ACQUISITION COMPANY | § | |
| LLC, PAA GP LLC, PLAINS AAP, L.P., | § | |
| and PLAINS ALL AMERICAN GP LLC, | § | |
| | § | |
| Defendants. | § | |

## CLASS ACTION COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff Robert Evans ("Plaintiff"), by his attorneys, brings the following class action on behalf of himself and all unitholders of PAA Natural Gas Storage, L.P. ("PNG" or the "Partnership"), other than Defendants (defined below) and their affiliates, against Defendants Plains All American Pipeline, L.P. ("PAA"), PNGS GP LLC ("PNGS"), PAA GP LLC ("PAA GP"), Plains AAP, L.P. ("AAP"), PAA Acquisition Company LLC ("Merger Sub"), Plains All American GP LLC ("Plains GP"), and certain members of PNGS's board of directors (the "Board" or "Individual Defendants") for breaching their fiduciary duties (or aiding and abetting thereof) in connection with PAA's proposed acquisition of the remaining interest in PNG that it does not already own (the "Proposed Transaction"). Plaintiff also brings this action

1

individually for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9 promulgated thereunder.  The allegations in the Complaint are based on information and belief, including investigation of counsel and review of publicly available information, except for Plaintiff's own acts, which are alleged on personal knowledge.

## SUMMARY OF THE ACTION

1.      On October 22, 2013, PAA and PNG issued a joint press release announcing that they had entered into a merger agreement (the "Merger Agreement") for PAA to acquire PNG in a unit-for-unit merger with a total equity value of $1.41 billion.  Under the terms of the Merger Agreement, PNG's public unitholders will receive 0.445 common units of PAA per PNG common unit surrendered pursuant to the Merger Agreement, plus cash in lieu of any fractional common units of PAA otherwise issuable in the transaction (the "Proposed Transaction").  The consideration to be received by PNG unitholders is valued at $22.61 per common unit as of November 11, 2013.  The Proposed Transaction is expected to close in the fourth quarter of 2013.

2.      Even though the Proposed Transaction will fundamentally alter the nature of PNG unitholders' investment and offers virtually no premium despite significant synergies for PAA, PNG's unitholders were effectively powerless to prevent the transaction from going forward. Pursuant to the Partnership's operating agreement, the Proposed Transaction is subject to a simple majority vote of unitholders.  Because PAA owns 46% of PNG's outstanding common units, the Proposed Transaction is already almost functionally locked up for approval by PAA. In fact, PAA refused on several occasions to cleanse the conflicted Proposed Transaction through a provision in the Merger Agreement that would have required the approval of the deal based on the affirmative vote of the majority of the remaining PNG unitholders not affiliated with PAA.

3.     Additionally, prior to the announcement of the Proposed Transaction, PAA's control over PNG extended beyond its dominant voting block and its control over the Board. PAA also exercised actual control over PNG by virtue of its overlapping executives and directors and its functional control over PNG's day-to-day operation and business.  PAA and the other defendants thus cannot rely on the protections of the business judgment rule.

4.     PAA's control over the Board's negotiation of the Proposed Transaction, and the use of its influence to ensure that any agreement reached would be on PAA's terms, illustrates the extent to which the Proposed Transaction resulted from an unfair process.  Several of the Individual Defendants (defined below) hold executive positions on multiple boards within PNG's web of entities, and all of the Individual Defendants are beholden to PAA for their compensation.  In fact, the conduct of the Conflicts Committee was nothing more than a formality, carried out in bad faith to offer the false pretense of satisfying fiduciary duties in order to ratify Defendants' plan to recapture PNG's valuable assets at less than fair value for PNG's benefit and to the detriment of the non-affiliated PNG unitholders.

5.     As detailed herein, the result of this unfair process was an unfair price in violation of the entire fairness standard.  While the Proposed Transaction is valued at approximately $1.41 billion, it only provides a meager 9% premium to PNG unitholders based on the closing price of PNG's units on August 27, 2013, the day PNG and PAA announced that PAA offered the 0.435 exchange ratio proposal to the Board.  Notably, the market itself is reflecting that PNG has been undervalued by the Board, as PNG's unit price (as of October 23, 2013) was trading above the current value of the exchange ratio.  The Proposed Transaction will also forcibly change the nature of the unitholders' investment at an unfairly low price and will not give unitholders a chance to seek a judicially set higher payout through appraisal.

6.     Importantly, Section 7.9 of PNG's Amended and Restated Agreement of Limited Partnership (the "Partnership Agreement") by its express terms does not apply to conflicts between PAA, PNG, and the remaining PNG unitholders.  Similar to Vice Chancellor John W. Noble's ruling in *In re Atlas Energy Resources, LLC, Unitholder Litigation*, C.A. No. 4589-VCN, 2010 Del. Ch. LEXIS 216 (Del. Ch. July 20, 2010), because the Partnership Agreement does not eliminate or alter the traditional fiduciary duties imposed under the law in the context of mergers with and into a controlling unitholder, Defendants are obligated to prove that the Proposed Transaction was "entirely fair" to PNG's public unitholders.

7.     The Individual Defendants have also exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with deal protection devices that prevent other bidders from making successful competing offers for the Partnership.  Specifically, pursuant to the Merger Agreement, Defendants agreed to: (i) a "no solicitation" provision that precludes PNG, from providing confidential information to, or even communicating with, potential third-parties except under very limited circumstances; (ii) an "information rights" provision that requires PNG to provide defendant PAA with confidential, non-public information about any competing bidder and their proposal, which they can use to top any bid; and (iii) a "matching rights" provision providing for PAA to match the terms of any competing proposal.  These provisions conjunctively and improperly create barriers to competing bidders and/or offers and substantially increase the likelihood that the Proposed Transaction will be consummated, leaving PNG unitholders with a limited opportunity to consider any superior proposals.

8.     On November 8, 2013, PNG and PAA filed on Form S-4 a Registration Statement (the "Registration Statement") with the Securities and Exchange Commission (the "SEC"), which further misrepresents and fails to disclose material information necessary for the

Partnership's unitholders to make an informed decision as to whether to vote their units in favor of the Proposed Transaction.   Specifically, the Registration Statement fails to disclose, in violation of both the Board's duty of candor under state law and Sections 14(a) and 20(a) of the Exchange Act, (i) certain management projection metrics relied upon by Evercore Group L.L.C. ("Evercore"), the financial advisor to PNG on the Proposed Transaction, to perform and render its fairness opinion; (ii) certain information regarding the financial analysis performed by Evercore in rendering its fairness opinion; and (iii) an important detail regarding the process leading up to the signing of the Merger Agreement.

9.      As a result of the foregoing, and as detailed herein, by agreeing to enter the Proposed Transaction, the Board breached its fiduciary duties to PNG's unitholders.  In the event that Defendants do not cure these fiduciary duties in response to the claims and allegations set forth herein, Plaintiff respectfully submits that the Proposed Transaction should be enjoined, the Merger Agreement should be rescinded, and/or damages should be awarded to the proposed Class.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under Sections 14(a) and 20(a) of the Exchange Act.  The Court has supplemental jurisdiction over any claims arising under the state law pursuant to 28 U.S.C. § 1367.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because PNG has its primary place of business in this District.

12.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.  Plaintiff is, and has been at all relevant times, the owner of PNG common units.

14.  PNG is a limited partnership formed by PAA and organized under the laws of the State of Delaware. The Partnership maintains its principal executive offices at 333 Clay Street, Suite 1500, Houston, Texas. PNG's business consists of the acquisition, development, ownership, operation, and commercial management of natural gas storage facilities. The Partnership's common units trade on the New York Stock Exchange ("NYSE") under the ticker symbol "PNG."

15.  Defendant PNGS is a Delaware limited liability company and the sole general partner (2% general partner interest) of PNG, with the sole responsibility for conducting PNG's business and for managing PNG's operations. The members of PNGS's board of directors (*i.e.*, the Board) are responsible for overseeing PNG.

16.  Defendant Greg L. Armstrong ("Armstrong") has served as Chairman of the Board and Chief Executive Officer ("CEO") of PNGS since January 2010 and as Chairman and CEO of PAA's general partner since 1998.

17.  Defendant Harry N. Pefanis ("Pefanis") has served as Vice Chairman of the Board of PNGS since January 2010 and as President and Chief Operating Officer of PAA's general partner since 1998.

18.  Defendant Al Swanson ("Swanson") has served as Executive Vice President, Chief Operation Officer ("CFO"), and director of PNGS since July 2011 and as Executive Vice President and CFO of PAA's general partner since February 2011.

19.     Defendant Constantine ("Dean") S. Liollio ("Liollio") has served as the President and director of PNGS since January 2010.

20.     Defendant Victor Burk ("Burk") has served as a director of PNGS and PAA since April 2010.

21.     Defendant Bobby S. Shackouls ("Shackouls") has served as a director of PNGS and PAA since April 2010.

22.     Defendant Arthur L. Smith ("Smith") has served as a director of PNGS and PAA since December 2010.

23.     Defendants Armstrong, Pefanis, Swanson, Liollio, Burk, Shackouls, and Smith are collectively referred to hereinafter as the "Individual Defendants."

24.     Defendant PAA is a publicly traded master limited partnership ("MLP") engaged in the transportation, storage, terminalling, and marketing of crude oil.  PAA holds a 100% member interest in PNGS, PNG's general partner and is the controlling unitholder of PNG, holding approximately 46% of all the outstanding units of PNG.  PAA's common units trade on the NYSE under the ticker symbol "PAA."

25.     Defendant Merger Sub  is  a  Delaware limited liability company and is a wholly-owned subsidiary of PAA.  Merger Sub was created solely for the purposes of effectuating the Proposed Transaction.  Following the consummation of the Proposed Transaction, Merger Sub will cease to exist as a separate corporate entity.

26.     Defendant PAA GP is a Delaware limited company and the sole general partner of PAA.

27.     Defendant AAP is a Delaware limited partnership and the sole member of PAA GP.

28.     Defendant Plains GP is a Delaware limited liability company and the general partner of AAP.

29.     Defendants PNG, PNGS, PAA, PAA GP, AAP, Plains GP, Merger Sub, and the Individual Defendants are referred to herein as the "Defendants."

### THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

30.     By reason of the Individual Defendants' positions as officers and/or directors of PNG, PNGS, and PAA, they owe fiduciary duties to Plaintiff and the other public unitholders of PNG, including the duty of loyalty, due care, good faith, and candor.  Among these fiduciary duties are (1) the duty of the Board to maximize the price by securing a fair premium for PNG unitholders and (2) the duty of the Board to avoid conflicts of interest or divided loyalties by preferring one unitholder or a group of unitholders' interests over another.

31.     PNG and the Individual Defendants' duties were not modified by PNG's Partnership Agreement, and even if such agreement applied, Defendants acted in bad faith.

32.     Thus, where the officers and/or directors of a publicly traded entity undertake a transaction that will result in either: (i) a change in corporate control; (ii) a breakup of the entity's assets; or (iii) sale of the entity, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the entity's unitholders, and if such transaction will result in a change of control, the unitholders are entitled to receive a significant premium. To diligently comply with their fiduciary duties, the directors and/or officers may not take any action that:

     a.     Adversely affects the value provided to the entity's unitholders;

     b.     Favors themselves or will discourage or inhibit alternative offers to purchase control of the entity or its assets;

     c.     Contractually prohibits them from complying with their fiduciary duties;

    d.  Will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the entity's unitholders; and/or

    e.  Will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public unitholders.

33. In accordance with their duties of loyalty, due care, good faith, and candor, the Individual Defendants, as directors and/or officers of PNGS, PNG, and PAA are obligated to refrain from:

    a.  Participating in any transaction where the directors or officers' loyalties are divided;

    b.  Participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public unitholders of the entity; and/or

    c.  Unjustly enriching themselves at the expense or to the detriment of the public unitholders.

  34.  Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, due care, good faith, and candor owed to Plaintiff and other unitholders of PNG, or are aiding and abetting others in violating those duties.

## CLASS ACTION ALLEGATIONS

  35.  Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all unitholders of PNG who are being and will be harmed by Defendants' actions described herein (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

36.     This action is properly maintainable as a class action for the following reasons:

a.     The Class is so numerous that joinder of all members is impracticable.  As of October 31, 2013, PNG had 61,158,699 common units outstanding.  The holders of these units are believed to be geographically dispersed throughout the United States;

b.     There are questions of law and fact that are common to the Class and which predominate over questions affecting any individual Class member.   The common questions include, *inter alia*, the following:

    i.     Whether PAA, as controlling unitholder, breached its fiduciary duties and other common law duties to the controlled unitholders of PNG, by abusing its power to compel the Proposed Transaction at an unfair price;

    ii.     Whether the Individual Defendants breached their fiduciary duties and other common law duties by entering into the Merger Agreement;

    iii.     Whether the Individual Defendants have breached their fiduciary duty to maximize unitholder value for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

    iv.     Whether the Individual Defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Partnership or its assets;

    v.     Whether the Individual Defendants misrepresented or omitted material facts in violation of their fiduciary duties owed by them to Plaintiff and other members of the Class;

    vi.     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the transactions complained of herein consummated;

    vii.     Whether PNG, PNGS, PAA, PAA GP, AAP, Plains GP, and Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty; and

    viii.     Whether Plaintiff and/or the Class are entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

c.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

d.     Plaintiff is an adequate representative for the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede the ability to protect their interests; and

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

37.     PNG was formed in 2005 by PAA to acquire, develop, operate, and commercially manage natural gas facilities.  Additionally, the Partnership owns and operates two natural gas storage facilities in Louisiana and Michigan, and has recently closed an acquisition of a third natural gas storage facility in Mississippi.  The Partnership also provides natural gas storage services to a broad mix of customers, including local gas distribution companies, electric utilities, pipelines, direct industrial users, electric power generators, marketers, producers, and Liquefied Natural Gas importers.  PAA owns approximately 46% of the common units of PNG. PAA also controls PNG, through PNGS, PNG's general partner, who is responsible for operating and managing PNG.

38.     The Partnership's principal strategy is to "capitalize" on the long-term growth in the demand for natural gas storage services in North America by owning storage facilities and providing its current customers reliable, competitive, and flexible natural gas storage services.  In addition, the Partnership is driven to "grow [] earnings and cash flow and increase the amount of cash distributions . . . over time."[1]  The primary strategy for achieving the dividend objective is to:

> ➢ Optimizing [PNG's] existing natural gas storage facilities.  [PNG's] primary commercial objective is to generate a significant portion of [its] revenues by committing a high percentage of our storage capacity under firm multi-year storage contracts.  [PNG] also provide [its] customers with a variety of hub services that are designed to accommodate customer needs, maximize the utilization of our assets and optimize our earnings and cash flow.   Commercially and operationally, [PNG] routinely seek to optimize [its] profitability by executing various initiatives that increase [its] efficiency, reliability and flexibility.

> ➢ Organically expanding [PNG's] existing natural gas storage facilities. [PNG's] existing assets enable [it] to expand [its] storage capacity on what [it] believe[s] to be attractive economic terms.  [PNG] currently ha[s] permitted expansion activities underway at each of [its] three facilities.  Including the acquisition of Southern Pines in February 2011 and expansions that are currently permitted and under construction, [PNG] ha[s] the potential to increase [its] capacity from approximately 50 billion cubic feet (Bcf) of working capacity at December 31, 2010 to an aggregate of over 110 Bcf of working capacity at these three facilities.

> ➢ Pursuing [PNG's] strategic and accretive acquisition or development projects.  [PNG] continually evaluate[s] opportunities to acquire or develop new natural gas storage facilities in [its] existing and new markets.  In general, [PNG] [is] seeking acquisition or development opportunities that will be accretive (or result in an increase in distributable cash flow on a per unit basis) and that will add natural gas storage assets or facilities that either complement [its] existing assets or strategically enhance [its] overall business by facilitating [its] entry into a desirable new market, diversifying [its] customer base or positioning [itself] for future growth.

---

[1] *See* PAA Natural Gas Storage, L.P. filed with the SEC on Form 10-K on March 2, 2011.

➢ Leasing [PNG] storage capacity and transportation services from third parties to enhance operational flexibility.  In order to supplement [PNG's] owned storage capacity, increase [its] operating flexibility, enhance the services that [it is] capable of offering to [its] customers and optimize the commercial performance of [its] assets, [PNG] periodically lease[s] storage and/or transportation capacity from third parties.

➢ Utilizing a portion of [PNG] owned and leased storage capacity to enhance [its] commercial management activities.  Similar to the business model successfully employed by PAA, and without altering [its] basic commercial strategy of committing a high percentage of [its] storage capacity under firm multi-year storage contracts at attractive rates, during 2010 [PNG] established a dedicated commercial marketing group that will capture market opportunities by leasing storage capacity for [its] own account and engaging in related commercial marketing activities.

**B.    The Partnership's Strong Performance**

39.    The Partnership's strong financial performance has been demonstrated by its ability to pay a consistent cash dividend to its unitholders, which is the Partnership's primary objective (see chart below):

| Date Declared | Date Paid | Distribution per unit |
|---|---|---|
| July 8, 2013 | August 14, 2013 | $ 0.3575 |
| April 8, 2013 | May 15, 2013 | $ 0.3575 |
| January 7, 2013 | February 14, 2013 | $ 0.3575 |

40.    On May 6, 2013, the Partnership issued future guidance for the second quarter of 2013 and second half guidance for 2013.  For the remainder of 2013, the Partnership projects that Net Income available to limited partners will be within the range of $32.5–$36.3 million dollars, which will be available for future distribution to unitholders.

41.    Moreover on August 5, 2013, the Partnership once again revised its guidance upward, projecting even stronger future growth for the remainder of 2013.  The Partnership

projected that Net Income available to the limited partners could be as much as $32.9 million dollars, which will be available for future distribution to unitholders.

42.     Rather than permitting PAA's units to trade freely and allow its public unitholders to reap the benefits of PAA's increasingly positive financial prospects and increasing common unit cash distributions, the Individual Defendants chose instead to sell PNG to PAA and cap the possible return for unitholders.

### C.     The Proposed Transaction

43.     On October 22, 2013, PNG and PAA issued a joint press release announcing the Proposed Transaction, which stated, in relevant part, the following:

> PAA Natural Gas Storage, L.P. (NYSE:PNG) today announced that it has entered into a definitive agreement and plan of merger with Plains All American Pipeline, L.P. (the "Merger Agreement") that provides for a merger whereby PNG will become a wholly-owned subsidiary of Plains All American Pipeline, L.P. ("PAA") through a unit-for-unit exchange (the "Merger").  Under the terms of the Merger Agreement, PNG's public unitholders will receive 0.445 common units of PAA per PNG common unit surrendered pursuant to the Merger Agreement, plus cash in lieu of any fractional common units of PAA otherwise issuable in the Merger.

> The transaction is expected to result in approximately 14.7 million additional common units being issued by PAA.  The terms of the Merger Agreement were approved by the Conflicts Committee of the board of directors of the general partner of PNG (the "Conflicts Committee"), which negotiated the terms on behalf of PNG.  The Conflicts Committee is comprised solely of independent directors.  In addition, Evercore acted as financial advisor to the Conflicts Committee and delivered a fairness opinion to the Conflicts Committee in connection with the transaction.

> The closing of the Merger is subject to the satisfaction of certain conditions, including the approval of the Merger and the Merger Agreement at a special meeting of unitholders by the affirmative vote of holders of a majority of the outstanding PNG common units (including the PNG common units held by PAA) voting as a separate class and the affirmative vote of holders of a majority of PNG's outstanding subordinated units voting as a separate class.  PAA owns 100% of the membership interests in the general partner of PNG, 100% of the outstanding subordinated units of PNG and approximately 46% of the 61.2 million outstanding common units of PNG.  Pursuant to the Merger Agreement, PAA has agreed to vote its common units and subordinated units in favor of the

Merger.  The parties anticipate that the Merger will close in the latter half of the fourth quarter of 2013, and that the previously announced quarterly distribution of $0.3575 per PNG common unit payable to holders of record of such units on November 1, 2013 will be paid on November 14, 2013 as scheduled.

**D.     The Proposed Transaction Was Not Entirely Fair to PNG Unitholders**

44.     The Proposed Transaction offers PNG unitholders an unfair and inadequate price that fails to comport with the fiduciary duties owed by the Individual Defendants to PNG's unitholders.  The exchange ratio of 0.445 of PNG units for each unit of PAA represents a mere 9% premium from the unit price at the time PAA's proposal was first made on August 27, 2013 to the Board.  The exchange ratio is inadequate and ignores the historical performance, the underlying value, and the future prospects of the Partnership.  Moreover, under the terms of the Merger Agreement, the incentive distribution rights under PAA's Agreement of Limited Partnership will be reduced by $12 million in each of 2014 and 2015, $10 million in 2016, and $5 million thereafter to the detriment of PNG's unitholders.

45.     More importantly, the meager premium offered to PNG's unitholders does not take into account that this is, in effect, a "minority squeeze-out" by PAA of the non-affiliated PNG unitholders as a result of the controlling voting interest in PNG, which will allow PAA to veto or vote down any alternative transactions.  In such situations, the normal course of business is for the Conflicts Committee to demand a "minority squeeze our premium."  Minority squeeze-out premiums are often significant and run into the 30% range.

46.     The Proposed Transaction likewise fails to offer fair compensation for forcing unitholders, through a locked-up transaction, to accept a fundamental change in the nature of their investment in the Partnership, *i.e.*, going from an investment in a high cash distribution entity to an investment in company that provides insignificant discretionary dividends.  Essentially, PAA wielded its position as controlling unitholder to push aside PNG's public

unitholders so that it could reap the rewards of the controlled unitholders' investment.  PNG's unitholders, however, are forced to accept a fundamentally different investment with none of the tax advantages and lower expected yields.

47.     Furthermore, PAA exercised actual control over PNG by virtue of its ownership of 46% of PNG's units, its indirect management of day-to-day operations through PNGS, and its power over interconnected and overlapping officers and directors, who were beholden to PAA for their compensation.  The conduct of the Conflicts Committee was therefore nothing more than a formality, carried out in bad faith to offer the false pretense of satisfying fiduciary duties in order to ratify Defendants' plan to recapture PNG's valuable assets at less than fair value for PAA's benefit and to the detriment of the non-affiliated PNG unitholders.

### E.     Section 7.9 of PNG's Partnership Agreement Does Not Alter or Eliminate Defendants' Common Law Fiduciary Duties in the Context of the Proposed Transaction

48.     Although the process and pricing of the sham approval of the Proposed Transaction was so fundamentally flawed to render it a de-facto "unfair" process and breach of fiduciary duties on equitable principles alone, PNG is a Delaware limited liability company and, therefore, the duties and obligations of its officers, directors, and PAA, as PNG's controlling unitholder and indirect manager, are purportedly set forth in PNG's Partnership Agreement.

49.     Section 7.9(a) of the Partnership Agreement states, in relevant part:

Unless otherwise expressly provided in this Agreement or any Group Member Agreement, ***whenever a potential conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership, any Group Member or any Partner, on the other***, any resolution or course of action by the General Partner or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement, of any Group Member Agreement, of any agreement contemplated herein or therein, or of any duty stated or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is (i) approved by Special Approval, (ii) approved by the vote of a majority of the Outstanding Common Units (excluding Common Units owned by the General

Partner and its Affiliates, directors and executive officers), (iii) determined by the General Partner (after due inquiry) to be on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties or (iv) approved by the General Partner (after due inquiry) based on a subjective belief that the course of action or determination that is the subject of such approval is fair and reasonable to the Partnership, which may include taking into account the totality of the circumstances and the relationships among the parties involved (including the short-term or long-term interests of the Partnership and other arrangements or relationships that could be considered favorable or advantageous to the Partnership) (Emphasis added).

50.     By its plain terms, Section 7.9(a) does not apply to conflicts between PAA and individual unitholders of PNG.  As the quoted paragraph above indicates, Section 7.9(a) only applies where "a potential conflict of interest exists or arises between the *General Partner* or any of its *Affiliates*, on the one hand, and the *Partnership*, any *Group Member*, any *Partner* or any *Assignee*, on the other . . . ."  Partnership Agreement § 7.9(a) (emphasis added).  In the context of the Proposed Transaction, where PAA is set to acquire all the remaining outstanding units of PNG, a potential conflict exists between PAA and the public unitholders of PNG regarding the price that PAA is willing to pay for the units of PNG that it did not already own.  Although PAA undoubtedly qualifies as an "Affiliate"[2] of PNG, the individual public unitholders of PNG do not

---

[2]  Section 1.1 of the Partnership Agreement provides the following definition for "Affiliate":

An "Affiliate" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with, the Person in question. As used herein, the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise; provided that the determination as to whether a Person, directly or indirectly through one or more intermediaries, controls, is controlled by or under common control with another Person shall be made taking into account, at the time of such determination, the context and circumstances surrounding such determination, including any known agreements or understandings that may impact such Person's possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such other Person. For the avoidance of doubt,

(a)  any individual who is an officer or director of the General Partner or any Group Member (excluding the Chief Executive Officer and Chairman of the Board of the General Partner) shall not be considered to be an Affiliate of the General Partner, a Departing General Partner or any Group Member by virtue of such Person's status as an officer or director and the possession of the powers that are within the scope of the designated or delegated authority of such officer or director;

qualify as a "Group Member," "Partner"[3] or "Assignee"[4] under the Partnership Agreement, thus rendering Section 7.9(a) wholly irrelevant.    The Partnership Agreement defines "Group Member" as "a member of the Partnership Group."   Partnership Agreement §1.1.   "Partnership Group," in turn, is defined as "the Partnership and its Subsidiaries treated as a single consolidated entity."  *Id.*  PNG's public unitholders are clearly not included in a straight-forward

---

    (b)   any individual who is an officer or director of PAA GP or any of its Affiliates other than the General Partner and the Group Members (excluding the Chief Executive Officer and Chairman of the Board of PAA GP) shall not be considered to be an Affiliate of the General Partner, a Departing General Partner, any Group Member, PAA GP or PAA by virtue of such Person's status as an officer or director and the possession of the powers that are within the scope of the designated or delegated authority of such officer or director;

    (c)   any Person that, alone or together with any Group of which such Person is a part, owns less than 50% of the total number of outstanding Class A units of the General Partner, shall not be considered to be an Affiliate of the General Partner, a Departing General Partner or any Group Member by virtue of the ownership by such Person (and Group, if applicable) of such Class A units; and

    (d)   any Person that, alone or together with any Group of which such Person is a part, owns less than 50% of the total "Percentage Interests" (as such term is defined in the Limited Liability Company Agreement of PAA GP) held by all members of PAA GP, shall not be considered to be an Affiliate of the General Partner, a Departing General Partner, any Group Member, PAA GP or PAA by virtue of the ownership by such Person (and Group, if applicable) of such interests. As used in clauses (c) and (d) above, the term "Group" shall have the meaning set forth herein except that the phrase "Partnership Interest" as used in such definition shall refer to (i) Class A units of the General Partner, in the case of clause (c) above, and (ii) Percentage Interests in PAA GP, in the case of clause (d) above.

[3] The Partnership Agreement defines "Partner" as "the General Partner and the Limited Partners." Partnership Agreement §1.1

[4] The Partnership Agreement provides the following definitions:

    "Limited Partner Interest" means the ownership interest of a Limited Partner in the Partnership, which may be evidenced by Common Units, Subordinated Units, Incentive Distribution Rights or other Partnership Interests or a combination thereof or interest therein, and includes any and all benefits to which such Limited Partner is entitled as provided in this Agreement, together with all obligations of such Limited Partner to comply with the terms and provisions of this Agreement; *provided, however*, that when the term "Limited Partner Interest" is used herein in the context of any vote or other approval, including Articles XIII and XIV, such term shall not, solely for such purpose, include any Incentive Distribution Right except as may otherwise be required by law.

    "Limited Partner" means, unless the context otherwise requires, the Organizational Limited Partner prior to its withdrawal from the Partnership, each Initial Limited Partner, each Additional Limited Partner and any Departing General Partner upon the change of its status from General Partner to Limited Partner pursuant to Section 11.3, in each case, in such Person's capacity as a limited partner of the Partnership; provided, however, that when the term "Limited Partner" is used herein in the context of any vote or other approval, including Articles XIII and XIV, such term shall not, solely for such purpose, include any holder of an Incentive Distribution Right (solely with respect to its Incentive Distribution Rights and not with respect to any other Limited Partner Interest held by such Person) except as may otherwise be required by law.

definition.   Thus, the provisions of Section 7.9(a) only apply to the resolution of conflicts of interest between PAA, on the one hand, and PNG itself or any subsidiaries of PNG, on the other. Put simply, Section 7.9(a)'s conflict provisions do not unambiguously absolve fiduciary duties with regard to conflicts between PAA and PNG's public unitholders.

**F.      The Unreasonable Deal Protection Devices**

51.      The Proposed Transaction is also unfair because, as part of the Merger Agreement, Defendants agreed to certain deal protection devices that operate conjunctively to ensure that no competing offers will emerge for the Partnership.

52.      For example, under § 6.6(b), the Merger Agreement contains a strict "no solicitation" provision prohibiting the members of the Board from taking any affirmative action to get a better price per unit for the Partnership, including soliciting alternative acquisition proposals or business combinations.  Specifically, § 6.6(b) requires that the Partnership and its representatives do not "directly or indirectly, (i) initiate, solicit, knowingly encourage or knowingly facilitate (including by way of furnishing information) any inquiries regarding, or the making or submission of any proposal or offer that constitutes, or may reasonably be expected to lead to, an Acquisition Proposal."

53.      The Merger Agreement also contains a "matching rights" provision, pursuant to which the Partnership must promptly notify PAA should it receive an unsolicited competing acquisition proposal.  Pursuant to § 6.6(b) of the Merger Agreement, the Partnership must notify PAA of the bidder's identity and the terms of the bidder's offer within forty-eight (48) hours.  Thereafter, if the Board determines that the competing acquisition proposal constitutes a "Superior Proposal," § 6.6(b) requires the Board grant PAA three (3) business days to amend the terms of the Merger Agreement so that the alternative acquisition proposal would no longer constitute a "Superior Proposal."

54.     The effect of these provisions is to prevent the Board from entering discussions or negotiations with other potential purchasers unless the Board can first determine that the competing acquisition proposal is, in fact, "superior," and even then, the Partnership must give PAA three (3) business days to match the competing acquisition proposal.   This severely limits the opportunity for a potential purchaser to emerge and severely limits the ability of the Board to properly exercise its fiduciary duties.

55.     Moreover, in connection with the Proposed Transaction, PAA has entered into a voting agreement to vote its units in favor of the Proposed Transaction and against any other proposal.   As a result, approximately 46% (through 28.2 million common units, 11.9 million Series A subordinated units, and 13.5 million Series B subordinated units, as well as incentive distribution rights) outstanding units of PNG are already locked up in favor of the Proposed Transaction.

56.     Ultimately, these deal protection devices restrain the Partnership's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Partnership.   The circumstances under which the Board may respond to an unsolicited alternative acquisition proposal that constitutes, or would reasonably be expected to constitute, a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.   Likewise, these provisions will foreclose the new bidder from providing the needed market check of PAA's inadequate offer.

### G.     The Materially Misleading Registration Statement

57.     On November 8, 2013, PNG and PAA filed the Registration Statement with the SEC.   The Registration Statement failed to provide the Partnership's unitholders with material information in contravention of the Board's duty of candor and in violation of Sections 14(a) and 20(a) of the Exchange Act.

58.     Without such information, PNG's unitholders will be unable to make a fully-informed decision as to whether to vote their units for or against the Proposed Transaction.

### 1. Materially Incomplete and Misleading Disclosures Regarding Management's Financial Projections

59.     The Registration Statement discloses that Evercore relied on certain PNG management projections from the Partnership to render its fairness opinion, including "mid-2013 PNG prepared updated financial forecasts ***and related sensitivities*** for the years 2014, 2015, 2016, 2017 and 2018" (emphasis added).  However, the Proxy fails to disclose the sensitivity projections.  This information is material because without this information, PNG unitholders are unable to quantify what value PNG's management placed on the Partnership and are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

60.     Further, although the Registration Statement, on page 49, discloses certain PNG management projections, its fails to disclose material projection metrics, including: (i) Tax Rate; (ii) Earnings before Interest, Tax, Depreciation, and Amortization ("EBITDA"); (iii) Earnings before Interest and Tax; (iv) Working Capital; (v) Amortization; (vi) Depreciation; and (vii) Unlevered Free Cash Flows.  This information is material because it allows PNG unitholders to calculate unlevered free cash flows, which is the best estimate of what management projects the future value of the Partnership to be today.

61.     Finally, the Registration Statement, on page 57, discloses that "Evercore performed its analysis to derive an indicative value range for PAA utilizing financial projections based on Wall Street Research, public filings and publicly-disclosed guidance of PAA management."  However, the Registration Statement fails to quantify what Evercore determined PAA's financial projections to be or the exact sources that Evercore used to calculate PAA's

financial projections.  This information is material because without this information, PNG unitholders are unable to quantify what value PAA's management placed on the Partnership.

    **2.**      **Materially Incomplete and Misleading Disclosures Concerning Evercore's Financial Analysis**

62.      The Registration Statement also discloses certain information regarding Evercore's financial analysis used to support its fairness opinion.  These disclosures concerning Evercore's financial analysis are materially incomplete and misleading in several ways.

63.      First, the Registration Statement, on pages 53 and 57, fails to disclose the basis and rationale for performing a *Discounted Cash Flow Analysis*.  This omission is material because without this information, PNG's unitholders are unable to fully understand Evercore's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

64.      Second, the Registration Statement, on pages 53 to 54, fails to disclose whether Evercore calculated unlevered free cash flows based on PNG's management projections.  If Evercore used PNG's management projections to calculate unlevered free cash flows, this information should be disclosed to PNG unitholders.  This omission is material because without this information, PNG's unitholders are unable to fully understand Evercore's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

65.      Third, the Registration Statement, on pages 53 and 57, fails to disclose the basis and rationale for using the Weighted Average Cost of Capital ("WACC") and the Capital Asset Pricing Model ("CAPM").  Additionally, since the WACC was used to calculate the discount rates in the *Discounted Cash Flow Analysis* for both PNG (6.5% to 7.5%) and PAA (5.5% to 6.5%), the Registration Statement must disclose the market assumptions used to calculate the

WACC on pages 53 to 54 and 57 to 58.  These omissions are material because without this information, PNG's unitholders are unable to fully understand Evercore's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

66.     Fourth, the Registration Statement, on pages 53 to 54, fails to disclose whether the range of perpetuity growth rates of 1.5% to 2.0% for PNG in the *Discounted Cash Flow Analysis* were derived from the *Precedent M&A Transaction Analysis* (pages 54 to 55) or the *Peer Group Trading Analysis* (pages 55 to 56).  This omission is material because without this information, PNG's unitholders are unable to fully understand Evercore's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

67.     Fifth, the Registration Statement, on pages 57 to 58, fails to disclose whether the range of perpetuity growth rates of 0.75% to 1.25% for PAA in the *Discounted Cash Flow Analysis* were derived from the *Precedent M&A Transaction Analysis* (pages 58 to 59) or the *Peer Group Trading Analysis* (pages 59 to 60).  This omission is material because without this information, PNG's unitholders are unable to fully understand Evercore's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

68.     Sixth, the Registration Statement, on page 53, discloses in the *Discounted Cash Flow Analysis* for PNG that the implied equity value range was "adjusted for net debt" but fails to quantify the debt.  This omission is material because without this information, PNG's unitholders are unable to fully understand Evercore's analysis and, thus, are unable to determine

what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

69.     Seventh, the Registration Statement, on pages 57 to 58, discloses in the *Discounted Cash Flow Analysis* for PAA that the implied equity value range was "adjusted for net debt" but fails to quantify the debt.   This omission is material because without this information, PNG's unitholders are unable to fully understand Evercore's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

70.     Eighth, the Registration Statement, on pages 54 to 55, fails to disclose the metrics and multiples observed by Evercore for PNG in the *Precedent M&A Transaction Analysis*[5] or the criteria Evercore used to select the aforementioned precedent transactions.   The Registration Statement also fails to disclose if other metrics and multiples (*i.e.*, Enterprise Value to Revenue, etc.) were considered but excluded for the chosen precedent transactions, and/or whether other transactions were considered but excluded from the analysis.   These omissions are material because without this information, PNG's unitholders are unable to fully understand Evercore's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

71.     Ninth, the Registration Statement, on pages 58 to 59, fails to disclose the metrics and multiples observed by Evercore for PAA in the *Precedent M&A Transaction Analysis* (*i.e.*, the observed multiples for each transaction, etc.)[6] or the criteria Evercore used to select the aforementioned precedent transactions.   The Registration Statement also fails to disclose if other

---

[5]  The multiples are particularly appropriate here given the wide variance between the low (6.5x) and high (17.0x) Enterprise Value to EBITDA multiples range.

[6]  The multiples are particularly appropriate here given the wide variance between the low (6.9x) and high (14.9x) Enterprise Value to EBITDA multiples range.

metrics and multiples (*i.e.*, Enterprise Value to Revenue, Enterprise Value to 2013 EBITDA, Enterprise Value to 2014 EBITDA, etc.) were considered but excluded for the chosen precedent transactions, and/or whether other transactions were considered but excluded from the analysis. These omissions are material because without this information, PNG's unitholders are unable to fully understand Evercore's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

72.     Tenth, the Registration Statement, on page 55, discloses in the *Precedent M&A Transaction Analysis* for PNG that the implied equity value range was "adjusted for net debt" but fails to quantify the debt.  This omission is material because without this information, PNG's unitholders are unable to fully understand Evercore's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

73.     Eleventh, the Registration Statement, on page 59, discloses in the *Precedent M&A Transaction Analysis* for PAA that the implied equity value range was "adjusted for net debt" but fails to quantify the debt.  This omission is material because without this information, PNG's unitholders are unable to fully understand Evercore's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

74.     Twelfth, the Registration Statement, on pages 55 to 56, fails to disclose the multiples and metrics (*i.e.*, Enterprise Value to 2013 EBITDA, Enterprise Value to 2014 EBITDA, Enterprise Value to 2015 EBITDA, etc.) observed by Evercore for the list of

companies used to compare against PNG in the *Peer Group Trading Analysis*[7] or the criteria Evercore used to select the aforementioned comparable companies.  The Registration Statement also fails to disclose if other metrics and multiples (*i.e.*, Enterprise Value to Last Twelve Months ("LTM") EBITDA, Enterprise Value to LTM Revenue, etc.) were considered but excluded for the chosen comparable companies, whether other companies were considered but excluded from the analysis, and why future multiples were considered over historic multiples.  These omissions are material because without this information, PNG's unitholders are unable to fully understand Evercore's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

75.     Thirteenth, the Registration Statement, on pages 59 to 60, fails to disclose the multiples and metrics (*i.e.*, Enterprise Value to 2013 EBITDA, Enterprise Value to 2014 EBITDA, Enterprise Value to 2015 EBITDA, etc.) observed by Evercore for the list of companies used to compare against PAA in the *Peer Group Trading Analysis*[8] or the criteria Evercore used to select the aforementioned comparable companies.  The Registration Statement also fails to disclose if other metrics and multiples (*i.e.*, Enterprise Value to Last Twelve Months ("LTM") EBITDA, Enterprise Value to LTM Revenue, etc.) were considered but excluded for the chosen comparable companies, whether other companies were considered but excluded from the analysis, and why future multiples were considered over historic multiples.  These omissions are material because without this information, PNG's unitholders are unable to fully understand

---

[7]  The multiples are particularly appropriate here given the wide variance between the low and high Enterprise Values to EBITDA multiples ranges for 2013, 2014, and 2015.

[8]  The multiples are particularly appropriate here given the wide variance between the low and high Enterprise Values to EBITDA multiples ranges for 2013, 2014, and 2015.

Evercore's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

76.     Finally, the Registration Statement, on page 56, fails to disclose the premiums (*i.e.*, 1-Day, 30-Days, and 52-Week High) observed by Evercore for the list of transactions used to compare against the Proposed Transaction in the *Premiums Paid Analysis*.[9]   This omission is material because without this information, PNG's unitholders are unable to fully understand Evercore's analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on whether to approve the Proposed Transaction.

### 3.     Materially Incomplete and Misleading Disclosures Concerning Regarding the Flawed Process

77.     The Registration Statement further omits an important detail regarding the process leading up to the signing of the Merger Agreement.

78.     Specifically, on page 38, the Registration Statement discloses that "Rutherford was asked to share PAA's valuation model behind the 0.435 PAA common unit exchange ratio. . . . [but he] declined to share this information."   PAA's valuation model behind the 0.435 exchange ratio is particularly material given that the Conflicts Committee repeatedly attempted to have PAA increase the exchange ratio without any success.   Without disclosure of PAA's valuation model, PNG unitholders do not know whether the Board negotiated in bad faith by allowing the Partnership to be sold at PAA's at an inadequate price.

79.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that PNG unitholders will continue to suffer absent judicial intervention.

---

[9]  The premiums are particularly appropriate here given the wide variance between the low and high Enterprise Values to EBITDA multiples ranges for 2013, 2014, and 2015.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class
for Breach of Fiduciary Duties Against PAA**

80.     Plaintiff repeats and realleges each and every allegation set forth herein.

81.     PAA (as controlling unitholder) owes the Class the utmost fiduciary duties of loyalty, due care, good faith, and candor.

82.     As the controlling unitholder of PNG, PAA's financial interests is directly adverse to the financial interests of PNG's controlled unitholders in connection with PAA's offer to acquire all PNG units that it did not own.  PAA wants to pay the lowest possible price to purchase the remaining units of the Partnership.  The Class of controlled unitholders wants to obtain the maximum value for their units.

83.     PAA did not act in accordance with the stringent "entire fairness" standard in connection with its buyout of PNG's controlled minority unitholders.  Under this standard, PAA must (but cannot) establish that the Proposed Transaction was the result of a fair process that returned a fair price to the controlled minority.  PAA's proposed merger consideration is inadequate and unfair, and since PAA dominated and controlled the process, effectively controlling the boards of both merging entities and/or stripping it of its powers, PAA has breached its fiduciary duties.

84.     PAA (as controlling unitholder) has failed to fulfill its fiduciary duties in connection with the Proposed Transaction.

85.     Plaintiff and the Class have been harmed by these breaches of fiduciary duty by PAA in the form of insufficient consideration for their units of PNG and are entitled to monetary damages absent judicial intervention enjoining the Proposed Transaction.

28

86.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendant's actions threaten to inflict.

## COUNT II

### On Behalf of Plaintiff and the Class for Breach of Fiduciary Duties
### Against the Individual Defendants

87.    Plaintiff repeats and realleges each and every allegation set forth herein.

88.    The Individual Defendants have violated fiduciary duties of loyalty, due care, good faith, and candor owed to public unitholders of PNG and have acted to put their personal interests ahead of the interests of PNG unitholders.

89.    The Individual Defendants have breached those duties by entering into an improper agreement whereby the Board (including the Conflicts Committee) ceded control over any fair merger process or negotiations with PAA to PAA, as the controlling unitholder.

90.    The Individual Defendants are obligated by their fiduciary duties to maximize the price paid for PNG units in connection with the Proposed Transaction, and are bound by the entire fairness standard to ensure that any merger with a controlling unitholder was accomplished by a fair process that returned a fair price.  The Individual Defendants have breached these duties.

91.    By reason of the foregoing acts, practices, and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.  Moreover, the Individual Defendants have failed to fully disclose to Plaintiff and the Class all material information

necessary to make an informed decision regarding whether to vote in favor of the Proposed Transaction.

92.     As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of PNG's assets and businesses and have been and will be prevented from obtaining a fair price for their common units.

93.     Unless Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

94.     Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendant's actions threaten to inflict.

## COUNT III

### On Behalf of Plaintiff and the Class Against
### PNG, PNGS, PAA, PAA GP, AAP, Plains GP, and Merger Sub for Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duties

95.     Plaintiff repeats and realleges each allegation set forth herein.

96.     PNG, PNGS, PAA, PAA GP, AAP, Plains GP, and Merger Sub (the "Entities") have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to PNG's public unitholders, and have participated in such breaches of fiduciary duties.

97.     The Entities knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, the Entities rendered substantial assistance in order to effectuate the

Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties.

98.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendant's actions threaten to inflict.

## COUNT IV

**On Behalf of Plaintiff Against PNG, PNGS, PAA, PAA GP, AAP, Plains GP, and the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

99.    Plaintiff repeats and realleges each allegation set forth herein.

100.    Plaintiff brings this Exchange Act claim on behalf of himself an individual only.

101.    PNG, PNGS, PAA, PAA GP, AAP, Plains, GP, and the Individual Defendants have caused the Registration Statement to be issued with the intention of soliciting unitholder support of the Proposed Transaction.

102.    Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction. Specifically, Section 14(a) provides that:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

103.    As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make

the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

104.    By virtue of the foregoing, PNG, PNGS, PAA, PAA GP, AAP, Plains GP, and the Individual Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. The Registration Statement violates Section 14(a) and SEC Rule 14a-9 because it omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, PNG, PNGS, PAA, and the Individual Defendants should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render then non-misleading.

105.    The misrepresentations and omissions in the Registration Statement are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the unitholder vote on the Proposed Transaction.

## COUNT IV

**On Behalf of Plaintiff Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

106.    Plaintiff repeats and realleges each allegation set forth herein.

107.    Plaintiff brings this Exchange Act claim on behalf of himself as an individual only.

108.    The Individual Defendants acted as controlling persons of PNG within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of PNG, and participation in and/or awareness of the Partnership's operations and/or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and

control, directly or indirectly, the decision making of the Partnership, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

109.    Each of the Individual Defendants were provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

110.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Partnership, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

111.    In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.  The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

112.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

113.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

114.    As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representative;

B.    Appointing Plaintiff's counsel as Class Counsel;

C.    Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Partnership adopts and implements a procedure or process to obtain a merger agreement providing fair terms to unitholders and requiring Defendants to fully disclose to Plaintiff and the Class all material information necessary to make an informed decision regarding whether to vote in favor of the Proposed Transaction;

D.    Rescinding, to the extent already implemented, the merger or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

E.    Declaration that the Proposed Transaction is not entirely fair and constitutes a breach of the fiduciary duties of the Defendants and, therefore, any agreement arising therefrom is unlawful and unenforceable;

F.    Directing the Individual Defendants to account to Plaintiff  and the Class for all damages suffered as a result of the Individual Defendants wrongdoing;

G.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

H.    Granting such other and further equitable relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury for all claims so triable.

DATED:  November 15, 2013.

Respectfully submitted,

_____*/s/ Thomas E. Bilek*_____
Thomas E. Bilek
TX Bar No. 02313525 / SDTX Bar No. 9338
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720
FAX (713) 227-9404

*Attorneys for Plaintiff*

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Juan E. Monteverde
David M. Sborz
369 Lexington Avenue, Tenth Floor
New York, NY  10017
Tel:  212-983-9330
Fax:  212-983-9331